UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-13356-GAO

BRIAN L. CHARKOWSKI,
Plaintiff,

v.

NANCY A. BERRYHILL,[1]
Defendant.

OPINION AND ORDER
March 22, 2017

O'TOOLE, D.J.

The plaintiff, Brian L. Charkowski, appeals the denial of his application for Social Security Disability Benefits ("DIB") by the Commissioner of Social Security ("Commissioner"). Before the Court are Charkowski's Motion to Reverse the Decision of the Commissioner (dkt. no. 16) and the Commissioner's Motion to Affirm the Commissioner's Decision (dkt. no. 20). After consideration of the administrative record and the parties' memoranda, the Court now affirms the Commissioner's decision because there is substantial evidence in the administrative record to support the decision and no error of law was made.

**I.     Procedural History**

Charkowski applied for DIB on January 3, 2012, alleging disability beginning January 3, 2012. (Administrative Tr. at 187–95, 221 [hereinafter R.]).[2] Charkowski's application was initially

---

[1] Nancy A. Berryhill is now the acting commissioner of the Social Security Administration. Therefore, pursuant to Federal Rule of Civil Procedure 25(d), Berryhill is automatically substituted as the defendant in this action.
[2] The administrative record has been filed electronically. The record is in its original paper form, with the page numbers in the lower right-hand corner of each page. Citations to the record are to the pages as originally numbered, rather than to numbering supplied by the electronic docket.

denied on September 18, 2012, (id. at 75–86), and again upon reconsideration on January 10, 2013. (Id. at 87–101.) Charkowski requested a hearing, (id. at 109–10), which was held before Administrative Law Judge Henry J. Hogan on March 4, 2014. (Id. at 41–74.) On March 28, 2014, the ALJ issued an unfavorable decision, stating that Charkowski could perform his past relevant work as a greeter based on his residual functional capacity ("RFC"). (Id. at 9–34.) Accordingly, the ALJ found that Charkowski was "not disabled" pursuant to the Social Security Act. (Id. at 33.) On July 15, 2015, the Appeals Council denied Charkowski's request for review. (Id. at 1–6.) This denial rendered the ALJ's decision the final decision of the Commissioner, and made the case suitable for review by this Court pursuant to 42 U.S.C. § 405(g).

## II.   Discussion

An individual may seek judicial review of a final decision by the Commissioner within sixty days of the decision. 42 U.S.C. § 405(g). Judicial review is restricted "to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000); accord Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001). Upon review, a court will uphold the ALJ's decision when it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is considered "more than a mere scintilla" and exists when there is sufficient relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Thus, a Commissioner's decision is affirmed "even if the record arguably could justify a different conclusion," Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (citing Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981)), for "factual inferences, credibility determinations, and resolutions of conflicts in the evidence are reserved to the Commissioner."

Conte v. McMahon, 472 F. Supp. 2d 39, 46 (D. Mass. 2007) (citing Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)). Further, the ALJ may rely upon findings and opinions of multiple physicians to ascertain medical facts. Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987).

Charkowski argues the ALJ decision should be overturned both for lack of substantial evidence to support the decision and for legal error. Specifically, Charkowski argues the ALJ erred by: (1) determining that Charkowski had a residual functional capacity ("RFC") that was inconsistent with the findings and conclusions expressed by reviewing Disability Determination Services ("DDS") physicians; (2) failing to comply with SSR 00-4p at step four; and (3) relying on vocational expert ("VE") Diane Durr's testimony to contravene the Grids.

The full and extensive administrative record is filed on the docket of this case, as is the lengthy written decision of the ALJ. There is no reason to rehearse the details of Charkowski's medical history or of the DIB application process except as is necessary to discuss the specific objections made to the Commissioner's decision.

> A. Substantial Evidence Supports the ALJ's Evaluation of Charkowski's Physical RFC
>
> > i. *Substantial Evidence Supports the ALJ's Decision to Adopt Portions of the DDS Physicians' Assessments of Charkowski's RFC*

Charkowski alleges that the ALJ erred in rejecting the opinions of the DDS physicians, Drs. Barbara Trockman and Jane Matthews, who found Charkowski limited to sedentary work.[3]

---

[3] Sedentary work is defined as work that
> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

(R. at 81–82, 95–96.) The ALJ assessed Charkowski with the RFC to perform light work with several limitations. (Id. at 14.) To make that determination, the ALJ afforded "partial and great weight" to Dr. Trockman's assessment of Charkowski's RFC at the initial stage and Dr. Matthews' assessment on reconsideration, as well as "evidence at [the] hearing level, including the fact that the claimant was returned to light work by [nurse practitioner ("NP") Veronica] Coutu in July 2012, and reports by Dr. Medeiros that the claimant can lift up to 20 pounds." (Id. at 30.)

Charkowski is correct in stating that DDS examiners are highly qualified experts in Social Security disability evaluations. However, an ALJ must consider the record as a whole when determining a claimant's RFC; even a treating physician's opinion is discounted if "inconsistent with the other substantial evidence in [the] case record."[4] 20 C.F.R. § 404.1527(c)(2). It is the prerogative of the ALJ to assess a claimant's RFC. Id. §§ 404.1527(e)(2), 404.1546(c). The ALJ must evaluate each medical opinion in the record, regardless of the source. Id. § 404.1527(c). The ALJ may weigh one opinion more heavily than another. Id. To decide how much weight to assign an opinion, the ALJ must consider: (1) the examining relationship between the claimant and the source; (2) the treatment relationship between the claimant and the source (including length of treatment relationship, frequency of examination, and the nature and extent of the treatment relationship); (3) the evidentiary support for the opinion; (4) the opinion's consistency with the entire record; (5) the specialization of the source; and (6) other factors the claimant or others raise. Id. § 404.1527(c)(1)–(6).

---

[4] A treating source is a claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. Nontreating sources include physicians and psychologists who have examined the claimant, but do not have an ongoing treatment relationship with the claimant. Id.

The ALJ determined that the DDS examiners' assessments of Charkowski's physical RFC which limited him to sedentary work were inconsistent with the medical record as a whole. First, as the Commissioner rightly points out, the DDS physicians did not have the opportunity to review NP Coutu's July 11th note releasing Charkowski to light duty, nor Dr. Medeiros's assessment that Charkowski was able to lift up to twenty pounds occasionally. (R. at 76–78, 88–92; Mem. of Law in Supp. of Def.'s Mot. to Affirm the Commissioner's Decision 13–14 (dkt. no. 21).) The ALJ is entitled to draw inferences from the record evidence. Johnson ex rel. M.C.J. v. Astrue, No. 11-11243-JLT, 2012 WL 1605984, at *7 (D. Mass. Apr. 12, 2012), *adopted by*, 2012 WL 1605982 (D. Mass. May 7, 2012). The ALJ may have inferred that the DDS examiners' assessments would have been different if they had known those additional facts.

Moreover, there was in the record substantial evidence to support the ALJ's determination that Charkowski possessed the RFC to perform light work, albeit with several limitations. Charkowski's self-reported range of daily activities in both Social Security Function Reports are generally inconsistent with limitations of sedentary work. (R. at 279–88.) At the hearing before the ALJ, Charkowski testified that he was able to cook, shop for groceries, drive his car, perform light housekeeping, and lift ten to fifteen pounds. (Id. at 52–54, 57–61.) His testimony in these respects was consistent with Dr. Trockman's notation in the "RFC – Additional Explanation" section that Charkowski had "independent ADLs,[5] meals, chores, drives, shops." (Id. at 82.) It is also worth noting that while both DDS examiners limited Charkowski to sedentary work, they also found him not disabled, and capable of performing his previous work as a greeter as actually performed. (Id. at 84, 98–99.)

---

[5] ADLs are "activities of daily living."

Although the ALJ's determination might not have been the only conclusion which could have been reached, "the resolution of conflicts in the evidence is for the Secretary, not the courts," Ortiz, 955 F.2d at 769 (citing Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)), and accordingly, "[w]here the facts permit diverse inferences, we will affirm the Secretary so long as the inferences drawn are supported by evidence."[6] Baez Velez v. Sec'y of Health & Human Servs., 993 F.2d 1530, at *7 (1st Cir. 1993) (per curiam) (unpublished table decision) (citing Rodriguez Pagan, 819 F.2d at 3).

      ii.    *Substantial Evidence Supports the ALJ's Decision to Rely on the Findings of NP Coutu and Dr. Medeiros*

Charkowski next objects that the ALJ erred in relying on the findings of NP Coutu and Dr. Medeiros because they are not "acceptable medical sources."[7] He is right that they do not fall within the definition of "acceptable medical sources" because NP Coutu is a nurse practitioner and Dr. Medeiros is a chiropractor. See 20 C.F.R. § 404.1513(a). However, as previously stated, an ALJ must consider all evidence in a claimant's record, which includes objective medical evidence, opinions from medical sources, and opinions from "other sources."[8] Id. §§ 404.1513(d), 404.1527(c). "[D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical

---

[6] Moreover, the ALJ had the opportunity to observe Charkowski, evaluate his demeanor, and determine how Charkowski's testimony coincided with the entire record, whereas the DDS examiners simply evaluated objective medical records. The ALJ's credibility determination is "entitled to deference, especially when supported by specific findings." Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) (citing DaRosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986)).

[7] Acceptable medical sources are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

[8] Other sources include "nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists." SSR 06-03P, 2006 WL 2329939 (Aug. 9, 2006).

source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." SSR 06-03p, 2006 WL 2329939, at *5 (Aug. 9, 2006).

The ALJ legitimately took into account NP Coutu's July 11th "light duty" note and Dr. Medeiros's assessment of Charkowski's capacity to lift twenty pounds. He specifically noted NP Coutu's treating relationship with Charkowski as justification for giving weight to her note releasing Charkowski to light duty. (R. at 30.) According to NP Coutu's treatment notes, Charkowski himself reported that his pain was improving and conveyed his desire to go back to work. (Id. at 424.) This statement is supported by other evidence in the record, such as Charkowski's reports that the intercostal nerve blocks he received on June 6, 2012, and July 6, 2012, at St. Anne's Pain Clinic had decreased his pain. (Id. at 420–21, 634, 637, 639.)

The ALJ stated that he gave Dr. Medeiros's opinion serious consideration in light of his treating relationship with Charkowski and afforded great weight to Dr. Medeiros's assessments that Charkowski was capable of lifting twenty pounds because of the evidence in the record. (Id. at 30.) For example, Charkowski testified at his hearing that he was capable of lifting up to fifteen pounds, often shopped for groceries, vacuumed, and drove his car. (Id. at 54, 57, 59.) In addition, Dr. Medeiros's own reports after Charkowski's weekly spine manipulations noted that the treatments had lessened his pain. (Id. at 714–17, 720–25, 833–43.) These weekly reports, as well as the results from Charkowski's October 2013 thoracic spine MRI, support the ALJ's statement that "there has been no objective evidence that his condition has deteriorated since" he was returned to light work.[9] (Id. at 30.) If an ALJ's decision "makes clear that he considered the factors," then he is "not required to expressly mention each factor" when determining how much

---

[9] Charkowski's October 2013 MRI results were largely consistent with his December 2012 MRI. (Id. at 758.) The findings were "statistically related to degenerative process." (Id.)

weight to afford each opinion. McNelley v. Colvin, No. 15-1871, 2016 WL 2941714, at *2 (1st Cir. Apr. 28, 2016) (citation omitted). In sum, the ALJ's decision to give great weight to NP Coutu's note releasing Charkowski to light duty, and Dr. Medeiros's assessment that Charkowski was capable of lifting up to twenty pounds, was consistent with the analysis required by 20 C.F.R. § 404.1527 and supported by substantial evidence.

> iii. *Substantial Evidence Supports the ALJ's Decision to Selectively Rely on Dr. Medeiros's Opinions*

Charkowski also argues that the ALJ's selective reliance on Dr. Medeiros's opinions was improper. The argument is unconvincing because the First Circuit has expressly permitted an ALJ "to piece together the relevant medical facts from the findings and opinions of multiple physicians." Evangelista, 826 F.2d at 144; see Howard v. Astrue, No. 06-96-B-W, 2007 WL 951389, at *5 (D. Me. Mar. 27, 2007), *adopted by*, 2007 WL 1146578 (D. Me. Apr. 16, 2007) (citation omitted) (stating that "[i]n this circuit, picking and choosing among experts' opinions does not in itself constitute error"). In other words, an ALJ does not have to accept the entirety of a doctor's opinion simply because he accepts part of it.

Here the ALJ's decision to selectively rely on Dr. Medeiros's two physical capacity evaluations was explained by his specific acknowledgement that aspects of the chiropractor's two physical capacity evaluations were incongruent with a good bit of the rest of the medical record, including Dr. Medeiros's own reports after Charkowski's weekly spine manipulations, which Dr. Medeiros noted provided relief. (R. at 30, 714–17, 720–25, 833–43.) For example, Dr. Medeiros's opinions in the physical capacity evaluations that Charkowski was only capable of sitting for one hour at a time, in an eight-hour workday, were inconsistent with Charkowski's own testimony at his administrative hearing, where Charkowski testified that he sat for four or five hours each morning watching television. (See id. at 59–60.)

It is the responsibility of the ALJ, not this Court, to resolve evidentiary conflicts and to draw factual inferences. Ortiz, 995 F.2d at 769. Because the ALJ explained his decision by citing substantial evidence in the record, "this Court is bound to affirm it, 'even if the record arguably could justify a different conclusion.'" Rivera v. Chater, 943 F. Supp. 90, 94 (D. Mass. 1996) (quoting Rodriguez Pagan, 819 F.2d at 3).

  B. Substantial Evidence Supports the ALJ's Decision to Rely on VE Durr's Testimony at Step Four

Charkowski argues that the ALJ failed to address a conflict between VE Durr's testimony that Charkowski could perform his previous work as a greeter, despite being limited to simple, repetitive tasks, and the Dictionary of Occupational Titles' ("DOT") description of a greeter, which requires a "specific vocational preparation" ("SVP") of three.

Charkowski's argument highlights a difference between the DOT and the Social Security regulations. The DOT classifies each occupation with a physical demand or strength factor, a nine-level SVP score, and a six-level general educational development ("GED") score. Appendix C – Components of the Definition Trailer, 1991 WL 688702 (Jan. 1, 2016). An SVP score is defined as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Id. An occupation with an SVP of three will take "over 1 month up to and including 3 months" to master. Id. A GED score is composed of three elements (reasoning, mathematics, and language development) which embrace the educational aspects required for a position. Id. A GED of three requires one to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and to "[d]eal with problems involving several concrete variables in or from standardized situations." Id. In contrast, the Social Security regulations divide

9

skill requirements into just three levels: unskilled work, semi-skilled work, and skilled work. 20 C.F.R. § 404.1568(a)–(c).

Because of the slightly different standards for classifying occupations by the DOT and by Social Security regulations, complete congruency is not to be expected. In an attempt to clarify this ambiguity, a Social Security Administration ("SSA") policy interpretation states in relevant part that "unskilled work corresponds to an SVP of 1–2; semi-skilled work corresponds to an SVP of 3–4; and skilled work corresponds to an SVP of 5–9 in the DOT." SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000). Further, the SSA opined, "[a]lthough there may be a reason for classifying an occupation's skill level differently than in the DOT, the regulatory definitions of skill levels are controlling." Id.

There was no error in the ALJ's reliance on VE Durr's testimony, nor was there an internal conflict for him to resolve. SSR 00-4p states that "[w]hen there is an apparent unresolved conflict between VE or [vocational specialist ("VS")] evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled." Id. at *2. In that situation, the adjudicator will "[a]sk the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT" and if "the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict." Id. at *4.

First, the ALJ began his examination of VE Durr by stating that he would assume her testimony was consistent with the DOT, unless she indicated otherwise, and she agreed with that assumption. (R. at 70.) Courts in this Circuit have stated that this instruction, along with testimony regarding requirements of jobs proposed by the VE (based on the VE's experience and DOT classifications) satisfies an adjudicator's responsibility to inquire into and to resolve potential

conflicts with the DOT. See Hargrow v. Colvin, No. 13-10170-DJC, 2014 WL 1153782, at *16 (D. Mass. Mar. 19, 2014); Wilcox v. Barnhart, No. 03-408-PB, 2004 WL 1733447, at *5 (D.N.H. July 28, 2004) (concluding that because the VE stated that his testimony was based on a job's description in the DOT, the ALJ had no reason to suspect a conflict between the VE's testimony and the DOT existed).

Second, because of the difference in benchmarks, the assignment of an SVP of three does not necessarily conflict with an RFC limiting the claimant to simple, routine work. See Auger v. Astrue, 792 F. Supp. 2d 92, 97 (D. Mass. 2011) (holding that "[t]his court joins the great weight of authority on this issue and holds that no conflict existed between the VE's testimony that Plaintiff could work as a surveillance system monitor despite being limited to 'simple and unskilled' work, and the DOT's level-three classification"); see also Thompson v. Astrue, No. 10-11742-JLT, 2012 WL 787367, at *10 (D. Mass. Feb. 17, 2012), adopted by, 2012 WL 787363 (D. Mass. Mar. 8, 2012) (stating that "the fact that Thompson's RFC was limited to carrying out simple two-to-three step instructions is therefore not necessarily inconsistent with the ALJ's determination that Thompson could return to his past relevant work as a laborer").[10]

Furthermore, surveying the record as a whole, there was substantial evidence to support the ALJ's decision to rely on VE Durr's testimony that Charkowski was capable of performing his past relevant work as a greeter. Charkowski stated in his first Function Report that he could follow written or spoken instructions and was able to get along with authority figures. (R. at 249–50.) In his second Function Report, Charkowski reported that he occasionally struggled to follow spoken

---

[10] Charkowski, in his Reply Brief, argues that this case is distinguishable from Auger v. Astrue, for Charkowski has moderate mental limitations, whereas the plaintiff in Auger had mild to moderate limitations. While this may be true, it is the responsibility of the ALJ to weigh the evidence and draw factual inferences, not this Court. See Ortiz, 955 F.2d at 769.

instructions, but was able to follow written instructions "pretty good" and was still able to get along well with authority figures. (Id. at 286–87.) This testimony indicates that Charkowski was more than capable of applying "commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and dealing "with problems involving several concrete variables in or from standardized situations." Appendix C – Components of the Definition Trailer, 1991 WL 688702 (Jan. 1, 2016).

Third, the DOT lists the "maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings." SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000); see Hargrow, 2014 WL 1153782, at *16. Charkowski's capabilities as described in his two Function Reports, in addition to the description he provided of his duties as a greeter, (R. at 264), provided the ALJ with substantial evidence to find that Charkowski was capable of performing his past relevant work as a greeter "as actually and generally performed."[11] (Id. at 31.) The ALJ could legitimately have inferred from Charkowski's own description of his position as actually performed that "stand[ing] at the door greeting people at the door as they came into the store and then as they left thanking them for shopping" could be characterized as simple, routine, repetitive work. (Id. at 264.) The SSA policy interpretation on past relevant work states:

> Under sections 404.1520(e) and 416.920(e) of the regulations, a claimant will be found to be "not disabled" when it is determined that he or she retains the RFC to perform:
>
> > (1) The actual functional demands and job duties of a particular past relevant job; *or*

---

[11] Charkowski's argument that VE Durr misunderstood the second hypothetical posed is without merit. It is clear that VE Durr perceived no conflict with a job with an SVP of three and Charkowski's limitation to "simple, routine, repetitive" work.

> (2) The functional demands and job duties of the occupation as generally required by employers throughout the national economy.

SSR 82-61, 1982 WL 31387, at *2 (Jan. 1, 1982). Given the permissive language of the policy interpretation, it is reasonable for the ALJ to have primarily relied on Charkowski's duties as actually performed, not the DOT classification as generally performed.

Charkowski's attorney was given ample opportunity to question VE Durr at the hearing, and no argument was raised regarding a conflict between VE Durr's testimony and the DOT classifications. Charkowski's failure to object to the hypotheticals at the hearing undercuts an attack on them now. See Torres v. Sec'y of Health & Human Servs., 870 F.2d 742, 746 (1st Cir. 1989). Courts in this District have held that an ALJ's duty to resolve conflicts in a VE's testimony arises only when the "inconsistencies are both 'apparent' and have been 'identified' in the administrative hearing." Jones v. Colvin, No. 14-12211-ADB, 2016 WL 1270233, at *7 (D. Mass. Mar. 31, 2016) (citing Aho v. Comm'r of Soc. Sec. Admin., No. 10-40052-FDS, 2011 WL 3511518, at *14 (D. Mass. Aug. 10, 2011)). As the conflict was not identified during the hearing, the ALJ was not obliged to explain the conflict. See Sullivan v. Colvin, No. 13-12907-FDS, 2015 WL 1308695, at *13 (D. Mass. Mar. 24, 2015) (citing Aho, 2011 WL 3511518, at *14).

C.      Any Error at Step Five was a Harmless Error

Charkowski's third argument is futile, because the ALJ properly found Charkowski not disabled at step four. See 20 C.F.R. § 404.1520(a)(4)(iv). ("At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.") Therefore, any mistakes in the ALJ's determination after the fourth step would be a harmless error and not provide a basis for remand. See Valentim v. Colvin, No. 14-14103-ADB, 2016 WL 1181660, at *8 (D. Mass. Mar. 25, 2016) (stating "[b]ecause the ALJ's step four finding is an independent basis for denying

Valentim's application, any deficiencies in the ALJ's step five finding are not grounds for remand"); see also Ward, 211 F.3d at 656 (noting that "[a] remand is not essential if it will amount to no more than an empty exercise") (citations omitted).

### III.     Conclusion

For all the reasons stated herein, Charkowski's Motion to Reverse the Decision of the Commissioner (dkt. no. 16) is DENIED, and the Commissioner's Motion to Affirm the Commissioner's Decision (dkt. no. 20) is GRANTED.

The decision of the Commissioner is AFFIRMED.

It is SO ORDERED.

                                              /s/ George A. O'Toole, Jr.
                                              United States District Judge